MUNICIPALITY OF VEGA BAJA, PLAINTIFF AND APPELLANT, v. SMITH, DEFENDANT AND APPELLEE.

### APPEAL from the District Court of San Juan in an Action to Abate a Nuisance.

No. 1746.—Decided on reconsideration July 10, 1919.

NUISANCE—PUBLIC ROAD—DEDICATION TO PUBLIC USE.—On the facts set up in the complaint in this action for the abatement of a nuisance caused by the closing up of a public road, it was *Held:* That although the complaint is not to be commended as a model pleading in a suit of this sort, yet full proof of the facts alleged would establish *prima facie* a dedication to public use by the former owners of the property and an acceptance by the public of such dedication.

ID.—ID.—ID.—The principle of dedication to public use has been recognized and acted upon by our Legislature, with reference to burial grounds and municipal roads at least, in subdivision 37 of section 102 of the Law of Evidence and subdivision 4 of section 65 of an Act to establish a system of local government; therefore a municipality may maintain an action for the reopening of a municipal road dedicated to public use for such a length of time that the public convenience would be affected by an interruption of its use.

The facts are stated in the opinion.

*Messrs. José de J. Esteves, Cay. Coll* and *Gustavo Cruzado* for the appellant.

*Mr. J. R. F. Savage* for the appellee.

MR. JUSTICE HUTCHISON delivered the opinion of the court.

The municipality of Vega Baja brought this suit to abate a nuisance and to enjoin the obstruction of a public road.

The district court dismissed the action after sustaining a demurrer to the amended complaint for want of facts sufficient to constitute a cause of action.

The essential averments are as follows:

"That within the municipality of Vega Baja, Porto Rico, there exists a neighborhood road called 'Pugnado Afuera Saliente' which, beginning in another road situated in the *barrio* Río Arriba, traverses the *barrio* Pugnado Afuera Saliente and connects with the Insular highway from Vega Baja to Morovis at hectometer 6, kilometer 1; that the said road passes from east to west through a property of 93 *cuerdas,* more or less, belonging to defendant and situated in the *barrios* of Río Abajo and Pugnado Afuera, entering the said property in the direction aforesaid at the boundary line between

the same and another property owned by the Vega Baja Fruit Company and leaving the property of defendant at the boundary line that separates the same from the farm of José Vega; that the said road has existed always as a neighborhood road, respected by the former owners of the property now owned by defendant, having been in the service of the public for more than twenty years, and belonging to the municipality of Vega Baja by right of constant use, being of record together with others at page 66 of the proper volume in the Department of the Interior; that the defendant, Mrs. Smith, without right has closed the said road, refuses to consent to travel by the neighborhood over the portion thereof that crosses her property and persists in such refusal notwithstanding the demands made upon her that she consent to the free travel that has existed always; that the said conduct of the defendant interrupts the legal use of other properties in the community, impedes the comfortable enjoyment of its life and of its property and constitutes a nuisance to the plaintiff municipality, and especially to the neighbors José López, Ramón Montalvo, Juan Eusebio García, Hermenejildo Serrano, Diego López, Félix Colón, Paulino Portela, Francisco Cabrera, Camilo Cabrera and others.''

On reversing the judgment of the district court, in an opinion dated April 29, 1918, we said:

''Full proof of these facts would establish *prima facie* a dedication to public use by the former owners of the property now belonging to defendant, and an acceptance by the public of such dedication.

''Even in the absence of any statutory provision, there would seem to be no sound reason why we should not be guided by the same rule that governs cases of this kind in other American courts.

''But, in addition to the broad equity powers conferred upon our courts by section 7 of the Civil Code, the principle involved has been recognized and acted upon by our legislature, with reference to burial grounds and municipal roads at least, in subdivisions No. 37 of section 102 of the Law of Evidence and No. 4 of section 65 of 'An Act to establish a system of local government, and for other purposes,' approved March 8, 1906.''

Thereupon appellee moved for a rehearing on the grounds, first, that the case had been heard and decided by only four members of this court and that it was the desire of plaintiff

to submit the question to a full bench; second, that the doctrine of dedication to public use, adopted by this court, had not been discussed by the parties, either in their briefs or at the hearing, and appellee being of the opinion that such doctrine is not applicable in Porto Rico, desired to argue this point before a full bench; third, that the doctrine of dedication is unknown to the civil law, but is a creature of the English common law, and therefore the application of this doctrine in Porto Rico deprives appellee of her property without the due process of law guaranteed by the Fifth Amendment to the Constitution of the United States and by the Civil Code of Porto Rico; fourth, that even if the said doctrine were applicable in Porto Rico, the facts stated in the complaint are not sufficient to constitute a cause of action.

Because of the importance of the question involved, of the fact that the doctrine in question had not been fully argued as such at the hearing, and because of some doubt as to the sufficiency of the complaint, this motion was granted and the case was re-submitted.

The brief of appellee quotes 13 Cyc. 437, to the effect that dedication (unknown to the civil law) is a common-law method of creating a public easement. This is followed by a quotation from the same volume (p. 439, note 16) to the effect that "the doctrine of prescription as applicable to public easements does not seem to be recognized in England at all. The origin of easements from immemorial user is founded on custom," etc., citing various British cases.

Attention is also called to the general rule, said to be an element of the doctrine of dedication and to have an important bearing on the question now under consideration, to the effect that on abandonment by the public of the use the real estate reverts to the owner who made the dedication. In this connection it is pointed out that under the civil law property of public ownership, when it ceases to be destined to general use, becomes a part of the property owned by the

State (*bienes propiedad del Estado*), citing article 341 of the Spanish Civil Code, Manresa thereon and *Mitchell* v. *Bass*, 33 Tex. 259.

It is also suggested that subdivision 37 of section 102 of the Law of Evidence refers solely and exclusively to cemeteries, does not mention roads and should not be extended to include the latter.

As to section 65 of the Municipal Law, it is urged that the same cannot be given retroactive effect even if it should be regarded as establishing from and after the date of its enactment the doctrine of dedication. The argument is that dedication being a matter of intention, an owner cannot be said to have intended to create a juridical situation unknown to the law at the time.

It is further pointed out that the Municipal Law speaks of roads that through use have acquired this character; that this must be interpreted in accordance with the former law; that, according to the *Siete Partidas*, although a discontinuous servitude of passage might be acquired by prescription, yet it was necessary in such case to show the existence of the servitude from time immemorial (*Díaz* v. *Vázquez*, 19 P. R. R. 1094); and that the doctrine of the *Siete Partidas* was modified by section 539 (546) of the Civil Code, providing that "Continuous and not apparent servitudes and discontinuous servitudes, either apparent or not apparent, can only be acquired by virtue of a title." Volume 5, page 839. *Enciclopedia Jurídica Española*, the commentary of Manresa on article 344 of the Spanish Civil Code, the Law of *Carreteras* of 1877 (extended to Porto Rico in 1886), the Law of Eminent Domain for Cuba and Porto Rico of June 13, 1884, and the Law of Public Works for Porto Rico of 1881, are cited to show the various subdivisions of ordinary roads or *carreteras* recognized by Spain and the necessity, as a prerequisite to a taking of private property for public use, of a declaration of public utility, a showing of the neces-

sity for the seizure and the fixing and payment of a proper indemnity.

Section 328 of the Civil Code, providing that "the property of public use in Porto Rico and the towns thereof comprise the insular and local roads, the squares, streets, fountains, and public waters, walks and public works for general use, paid for by the said towns or from the Treasury of Porto Rico, * * * " is quoted to show that in order to determine the ownership of a road under the law now in force, as well as under previous legislation, the source of the funds employed in the construction and maintenance thereof must be taken into account. *Díaz* v. *Vázquez, supra,* is also cited in this connection.

Section 539 of the Civil Code (532 of the Spanish Code) is also quoted in connection with the contention that a servitude of passage is a discontinuous servitude. *Albarrán* v. *Paz,* 18 P. R. R. 933; *Díaz* v. *Vázquez,* 19 P. R. R. 1094; *Giervolini* v. *Succession of Rodríguez,* 23 P. R. R. 808; *Torres* v. *Plazuela Sugar Co.,* 24 P. R. R. 451, are likewise cited on this point.

In support of the proposition that the facts stated in the complaint do not constitute a cause of action, appellee relies principally on the case of *Farr* v. *Wheelwright C. Co.,* 163 Pac. 256–57, although 37 Cyc. pp. 18–19 and 34 is cited on the question of the sufficiency of the allegation of a period of twenty years and as bearing on the question of the adverse character of the use.

Certainly, in this jurisdiction the common law is not a name to conjure with. Nor, on the other hand, need we be alarmed by the mere circumstance that any particular doctrine, if based on the bedrock of universal reason and justice, happens to be an offspring of the common law. When confronted with a case not covered by our Civil Code or other legislative enactment, we should neither fear the evil nor reject the good that is to be found in the principles of the common law or elsewhere in the experience of mankind.

Few tribunals are so unfettered by precedent, or, in matters not governed by statute, so free to follow the dictates of conscience and common sense as are the courts of this Island. To build, upon the fundamental principles so often found at bottom in both American and Spanish jurisprudence, a composite structure embodying the best elements of the two great systems and, in so far as may be, unmarred by the defects of either, is our peculiar privilege if we will but grasp the opportunity that lies before us.

"* * * Alongside of the doctrine of *bona fides,* as defined by the Roman prætor, may be set that of 'conscience' or 'equity' as entertained by the English Chancellor." Taylor, The Science of Jurisprudence, p. 509.

On the same page of the volume last mentioned, Lord Cottenham, referring to the Common Law and to the chancellor's equitable jurisdiction, and, of course, speaking without the sanction of any legislative enactment, is quoted as follows:

"* * * I think it is the duty of this court to adapt its practice and course of proceeding to the existing state of society, and not, by too strict an adherence, to decline to administer justice, and to enforce rights for which there is no other remedy."

A curious paraphrase of the language just quoted is found in section 7 of our Civil Code, which reads as follows:

"Any court which shall refuse to render a decision on the pretext of silence, obscurity, or unintelligibility of the laws, or for any other reason, shall be held liable therefor.

"When there is no statute applicable to the case at issue, the court shall decide in accordance with equity, which means that natural justice, as embodied in the general principles of jurisprudence and in accepted and established usages and customs, shall be taken into consideration."

The second paragraph of its prototype, article 6 of the Spanish Code, was not so broad, but provided that—

"When there is no law exactly applicable to the point in con-

troversy, the customs of the place shall be observed, and in the absence thereof, the general principles of law."

Commenting on this, Manresa says:

"The functions of the Departments of State, while distinct, are not absolutely dissevered. At times the legislative power exercises judicial functions as when the Upper Chamber acts as a jury, and at others the judicial system or power is endowed with attributes of a purely legislative character as occurs under the present article. Where the law is silent or defective it has been deemed advisable that, rather than leave the matter in suspense, the judge shall fix the rule of law applicable to the case submitted to him for decision, or, if the same is ambiguous, to interpret the same, pending the enactment by the legislature of a categorical law or the rendition of an authoritative interpretation of the ambiguous law."

Again, after discussing various aspects of the matter:

"Finally, the general principles of law, which necessarily acrequired legal force from the moment that courts of justice were required to hand down decisions in all cases, some of which were unattended by legal provisions, custom or jurisprudence, must be applied. Whether or not the law accepts the scientific principle, this can never lose its force. As a distinguished jurisconsult says, 'science will always analyze, draw comparisons and emphasize concordances, reconcile legal conflicts, adjust questions which arise in the construing of laws; and the legal doctrine, with more or less delay or rapidity, will necessarily be established, constitute the general rule, fix or determine the axioms of law, whether the so-termed traditional or such as may newly be formed, in accordance with the distinctive spirit permeating the institutions and will exercise the same control over the judicial mind as the enactments of the legislature. To fail to recognize this is to show an absolute ignorance of what is in truth the vitality of the law; to deny it is to ascribe to the powers of the law-makers the ambitious pretention of omniscience and omnipotence, not alone juridical but absolute and certain.

"The administration of the natural law is fundamentally a broad and indeterminate power which, in Rome, was restricted by the celebrated law of citations of Valentiniano III and in Spain by a Royal Decree of the Catholic Sovereigns, but the modern tendency is to enlarge the jurisdiction of courts both in civil and criminal

cases, in keeping with the civil codes of Portugal, Italy, Mexico and Perú."

That the doctrine of dedication or that the common law is based on custom is not an insuperable objection. Custom is equally the basis and the life of the civil law. Aside from the matter of attempted codification from time to time of the results obtained, the process of evolution is the same in both systems. In passing, as bearing to a certain extent on this subject, reference may be made to Scaevola, *Código Civil*, App. 2, pp. 14 to 17 included.

The jurists who by slow degrees erected the massive structure of British jurisprudence required no legislative aid or encouragement. In the absence of any expression of the legislative will there might be some room for argument as to whether or not we should adopt a similar course. But in the light of the code provision above quoted, there can be no question either as to the scope and extent of the power conferred or as to the nature of the duty imposed on the courts of this Island.

Although in the view we take of the matter the question of prescription, as such, is not necessarily involved, yet, as pointed out by a prominent practicing attorney who happened to be present at the second hearing and participated as *amicus curiae* in the discussion, authority is not wanting for the proposition that a servitude in favor of the public constitutes an exception to the general rule relied on by appellee.

"The cessation of servitudes because of the impossibility of the continuance of human acts is reasonable and effective when treating of the acts of one or more persons, but this doctrine is not applicable in the case of a community.

"In private easements, both voluntary and arising by force of law, the right is established in favor of a person certain if it is manifestly apparent that such person cannot exercise it uninterruptedly because of physical impossibility. But it is very different when an easement is established in favor of a community, that is to say, for

purposes of public and general utility. Here it is not the case of a person or his dependents (servants, workmen, etc.) who are alone entitled to enjoy the easement but of all those comprising the community (municipality and nation), and we are therefore of the opinion that if it is not of actual continuous use it must at least be so presumed. In fact, both in private easements and easements of public and general utility, continuance or discontinuance is based on a presumption which is true in its respective case. Easements of public and general utility imply a fixed and constant use as distinguished from private easements in which the use can be termed but discontinuous." Scaevola, vol. 10, p. 163.

"The distinguishing feature   *   *   *   between continuous and discontinuous easements seems to be that the use may or may not be uninterrupted. This cannot occur when its exercise depends upon the act of man, considered apart, whether a single proprietor, several co-owners or a *community* or *corporation*. But easements established for the benefit of the public, such as those of salvage, towing paths, etc., are not subject to this distinction; their use may be uninterrupted and the easement may be deemed continuous."

An interesting and somewhat similar distinction between private and public-service corporations was drawn in *Torres* v. *Plazuela Sugar Co., supra.* See also *Catholic Church Cases.*

The instant case, however, does not hinge on the question of servitude by prescription, but depends rather on the existence or non-existence of a presumptive, voluntary appropriation of the land by the owner to a public use. Bouvier, Vol. 1, p. 524; 18 C. J. p. 38, sec. 1; id. p. 40, sec. 3; id. p. 41, secs. 8, 9; id. pp. 57–58 (sec. 41) b, (sec. 42) b.

And the basic principle of an estoppel *in pais* is as well known to the civil law as it is to the jurisprudence of England and the United States. *Factum cuique suum, non adversario nocere debet.* (*Dig., libro I. Tit. XVII, reg. 155*). Or, in the broader generalization of Spanish jurisprudence, *Nadie puede ir contra sus propios actos y hechos.* Scaevola, *Código Civil,* 2 Apéndice, p. 27 *et seq.* and cases cited.

Most of the questions raised by appellee have been considered at one time or another by the Supreme Court of

Louisiana, where the doctrine of dedication was adopted at an early day and has been followed more or less uniformly, although not without certain misgivings at intervals, down to the present time.

In 1833 Judge Martin, dissenting in *De Armas v. Mayor, etc., of New Orleans,* 5 La. Rep. 132, referring to the then recent case of *Cincinnati v. White's Lessee,* 6 Peters, 431, said:

"* * * I have looked in vain in the opinion of the court, for a reference or allusion to any principle peculiar to the common law of England. It has appeared to me that the case was determined on the first broad and general principles of law mentioned in the *Corpus juris civilis,* viz: *Honest vivere,* "to act honestly"; from which is deduced the maxim of *pelliciti servare fidem*—"when we have made a promise, to keep it"; and the necessary corollary *turpe est fidem fallere*—"it is shameful to disappoint expectations we have authorized."

"But the consonance of the decision with the laws of Spain is manifest by its conformity to that of the highest judicial tribunal in Louisiana, declared two years before the retrocession to France."

In *New Orleans v. United States,* 10 Peters, 662, Mr. Webster, for the appellants, insisted "that the dedication of land to public uses is an estoppel of all subsequent claim to it, as well by the civil law as by the common law of England. French Pandects, arts. 15, 28; 3 Mart. (La.) 296, 303–4; 11 ibid. 660."

Mr. Livingston, also for the appellants, after an elaborate discussion of the dissenting opinion of Judge Martin in the *De Armas Case* and the doctrine of other early Louisiana cases, and, speaking of the theory of dedication, likewise submitted that

"* * * The law by which the city holds is not the mere common law, it is the law of eternal justice, pervading every system, common to every country, and from which every departure is an injustice, and an anomaly. What is given cannot be resumed, without wrong, any more than that can be taken which is derived from any other source. King, republic or individual, who gives a right

over a property, can no more resume it, than he can seize on that which he never possessed. The designation in the plan meant the same thing in Louisiana, under the French law, that it did in America, under the common law; in both, it was meant to give a right; in both, that right is sacred."

After a full discussion and consideration of the rights of the parties under the laws and usages of both France and Spain, the court, sustaining the theory of appellants and disposing of the argument founded on the supposition that as no grant for the land in contest had been proved none could be presumed, said:

" *   *   *   The doctrine of presumption is as fully recognized in the civil as it is in the common law. It is a principle which no enlightened tribunal, in the search of truth, and in applying facts to human affairs, can disregard."

We may also mention that the language of the dissenting opinion in the De Armas Case is quoted with approval in the unanimous opinion of the Supreme Court of Louisiana in City of Baton Rouge v. Berg, 21 La. Ann., 244, more than thirty-five years after the comment by Judge Martin was made.

Without further discussion of the Louisiana cases attention is invited to the following: Henthorp v. Bourg, 4 Martin (O. S.) 97; Municipality No. 2 v. Orleans Cotton Press, 18 La. 122; City Council of Lafayette v. Holland, 18 La. 286; Carrollton R. R. Co. v. Municipality No. 2, 19 La. 62; Linton v. Guillotte, 10 Rob. 357; New Orleans and C. R. Co. v. Carrollton, 3 La. Ann. 282; Hatch v. Arnault, 3 La. Ann. 482; Carrollton v. Jones, 7 La. Ann. 233; Municipality No. 2 v. Palfrey, 7 La. Ann. 497; Shreveport v. Walpole, 22 La. Ann. 526; McNeil v. Howell, 34 La. Ann. 1090; Heirs of Leonard v. Baton Rouge, 39 La. Ann., 275; Lawson v. Shreveport Water Works Co., 111 La. Rep. 74.

Conceding for the sake of argument the soundness of the doctrine announced in Farr v. Wheelwright, supra, to the

effect that "the facts constituting the dedication relied on must be pleaded," yet that case is clearly distinguishable. Perhaps a more tenable objection to the complaint herein would be that plaintiff does not allege in apt terms a dedication and acceptance as such, but rather the evidentiary circumstances instead of the ultimate fact. In the *Farr Case* plaintiffs alleged:

"That for more than thirty years immediately preceding the 1st day of March, 1906, the plaintiffs, their predecessors in interest and the public, have openly, notoriously, peaceably and with the consent of the defendant's predecessor in interest, and without objection, let or hindrance from any person whomsoever, excepting the defendant, as hereinafter set forth, used and traveled over, upon and across the tract of land described in the last preceding paragraph, and each and every part thereof, with teams, vehicles and on foot as a matter of convenience and necessity as a highway for the purpose of ingress and egress to and from the respective lands and premises owned by the plaintiffs and their predecessors in interest, and situated on the east and west sides of the tract of land described in the sixth paragraph of this complaint, and the lands lying and being immediately north and adjoining such last-named lands and premises."

Here, plaintiff, a municipality, not an adjoining landowner, sets up the existence of a public road used, not with the mere consent of respondent as a convenient means of ingress and egress to an from properties on either side of the land belonging to respondent, but as a neighborhood road belonging to the municipality, duly recorded as such, *respected* by the predecessors in interest of respondent and forming the connecting link between two public roads, one of them an insular highway. The evidence to be adduced at the trial may show that the alleged road is not in fact a neighborhood road but a mere private right of way; that the predecessors in interest of respondent did not respect it as a public road, but have merely tolerated the occasional or more or less habitual crossing of their property by a few of their neighbors. But to respect a public road as such

implies something more than mere passive acquiescence in travel across private property, and, in the absence of any objection other than that the facts stated do not constitute a cause of action, an averment of constant use by a municipality of a vicinal road respected as such for more than twenty years, sufficiently indicates the adverse character of the user.

However, the opinion in the case last mentioned does not hold that adverse user, as the term is understood in the acquisition of a real property right by prescription, is a necessary element of dedication. The decision is based on two distinct grounds, to wit, that "the facts constituting the dedication relied on must be pleaded," or if the claim be based on adverse user, as distinguished from dedication, the pleading must show the adverse character of the user. In that case there was no dedication because the complaint showed plainly that no public interest was involved. And the mere fact that for more than thirty years plaintiffs, adjoining landowners, had, with the consent of defendant, used his lands as a convenient means of ingress and egress to and from lands belonging to plaintiffs created no easement over the lands of defendant, for plaintiffs, by their own averment, were mere licensees.

"Dedication and prescription are distinguishable in that dedication is established by proof of an act of dedication and an intent to dedicate without reference to the period of public use, while long user is an essential element of prescription. Also prescription is an adverse holding under color of right, whereas dedication, whether express or implied, rests upon the consent of the owner. Further, the doctrine of prescription has been said not to apply strictly to public easements. However, dedication may be implied from facts and circumstances, and just as the doctrine of dedication grew up upon the foundation of public policy, so the doctrine of public easements by presumptive dedication has a legitimate foundation and is generally recognized, although there is some conflict of opinion on the question." 18 C. J., p. 40 (sec. 3) 3.

"The right or title acquired by dedication has its existence in the consent of the owner, either actual or implied, while the right or title acquired by adverse possession arises from the assertion of title in hostility to that of the record owner." Id. p. 41, (sec. 8) 8.

"Where land has been used continuously by the public with the owner's acquiescence for such a length of time that private rights and the public convenience and accommodation will be materially affected by an interruption of the enjoyment, a dedication will be presumed, and the doctrine of equitable estoppel applies with peculiar force to cases of this kind. Under these circumstances no specific length of user is necessary to constitute a valid dedication. It is not necessary that the use should be for the term of years necessary to presume a grant; it may be for a less term, if the duration of the term is such that the public accommodation and private rights might be materially affected by an interruption of the enjoyment of the easement. And the length of time of enjoyment is a fact for the jury to consider as tending to prove an actual dedication and an acceptance by the public." Id. p. 104 (sec. 119).

Some cases hold that use of land by the public for the prescriptive period of twenty years creates the presumption of dedication. 18 C. J. p. 101. Others adopt a period "equal to that prescribed by the statutes of limitation as a bar to actions for the recovery of land." Id. p. 102. The same courts which have thus adopted fixed periods by way of analogy to those required to vest title by prescription or to constitute a bar to real actions, seem to hold that "the use must be adverse, that is to say, under a claim of right, exclusive, with the owner's knowledge and acquiescence, and continuous and uninterrupted." Id. p. 100 (sec. 115) 5.

We are inclined to concede that, if the *ratio decidendi* of these cases can be reconciled at all with either the letter or the spirit of the Civil Code in the matter of servitudes and prescription, then not less than thirty years should be required in actions based solely and exclusively on adverse user.

A superficial comparison of the citations given under the proposition that the user must be adverse, with those in

support of the theory of an estoppel *in pais,* suggests a radical difference in point of view and a geographical grouping of cases rather than any nice distinction uniformly drawn in all jurisdictions between one class of cases and another according to the facts involved. We need not now determine either the existence of such possible conflict nor seek to ascertain how far the same may be due to a confusion of the true theory of dedication with that of prescription through adverse possession.

In the case at bar plaintiffs do not rely on any period fixed by statute, either for the acquisition of real property rights or as a bar to an action for the recovery of real property, unless the complaint be regarded as setting up a user from time immemorial, in which event it would state a cause of action independently of any question of dedication. And the averment as to interference with the lawful use of other properties in the neighborhood and with the community at large in the enjoyment of its life and property supplies the element of private rights, public convenience and accomodation if specific mention thereof be required to distinguish the instant case from those in which 'adverse possession for a prescriptive period is held to be indispensable.

As pointed out in our former opinion, the complaint is by no means a model of pleading. The sole question before us is whether or not the facts stated, viewed from any standpoint whatever, constitute a cause of action, and we would not be understood as deciding anything beyond this. It may be that anything short of full and complete proof of all the facts alleged would justify a motion for nonsuit. Perhaps a very slight explanation by the defendant of those facts, once established by plaintiff, might suffice to give the matter an entirely different color and thus turn the scale against the *prima facie* case as made by plaintiff. However vulnerable to attack on any other ground the complaint itself may be, and on this point no expression of opinion is in-

tended, we cannot say that the facts stated do not constitute a cause of action.

The judgment appealed from must be

*Reversed.*

Chief Justice Hernández and Justice del Toro concurred. Justices Wolf and Aldrey dissented.

NOTE.—Mr. Justice Htuchison also delivered the original opinion.

Justices Wolf and del Toro concurred.

Mr. Chief Justice Hernández concurred in the judgment.

Mr. Justice Aldrey took no part in the decision in the original opinion.

### DISSENTING OPINION OF MR. JUSTICE WOLF.

I agree with the majority opinion that dedication may arise in Porto Rico just as it may in the United States. Indeed, I agree with so much of the opinion as tends to support the doctrine of dedication, especially in so far as said doctrine is founded on a kind of estoppel. But whether dedication may be supposed to arise from a grant or from estoppel or any other principle, the facts to show the existence of such dedication must be stated in the complaint. I find the complaint lacking in this regard. To my mind there is nothing therein that shows either a grant or an estoppel. The statement that the road is a neighborhood road is to state the conclusion. In other words, that a dedication has arisen. Why is it a neighborhood road? The complaint, to my way of thinking, does not state. It admits that the road crosses the land of the defendant, and by implication admits that the proprietorship or ownership was in the defendant or her privies. The averment most nearly resembling a grant or an estoppel is that the predecessors of defendant had respected the neighborhood road. "Respected" is not inconsistent with "consented," but it may mean considerably less. No fact is introduced into the complaint to change what may be a mere act of toleration into an estoppel or a

grant. The case of *Plazuela Sugar Co.* v. *Torres,* cited in the majority opinion, shows, citing the code, that acts of mere toleration give no title and the facts proved by the Plaznela Sugar Co. were probably just as strong to show an estoppel as here.

But taking the complaint as a whole, it is evident that the complainant was relying on a prescriptive right and not on anything like a dedication. A prescriptive period of twenty years is alleged and it is my opinion that the pleader intended nothing else. While pleadings are to be construed liberally, the meaning of words should not be extended to give a complainant a right for which the basic facts are wanting.

It seems to me, moreover, that in the case of *Farr* v. *Wheelwright,* 163 Pac. 256–257, the facts in favor of dedication were even stronger than here. A consent was alleged in that case and a dedication was the basis of the action.

If the complainant had alleged that the defendant had acquiesced in public improvements on the road, or asked for protection thereon, or any other similar fact, an estoppel might have arisen, but there is nothing of this sort in the complaint.